UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JEREMY PAIGLY,

        Petitioner,

   v.

SCOTT FRAUENHEIM, Warden,

        Respondent.

Case No. 15-cv-05162-HSG (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

      Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Jeremy Paigly, challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition, and petitioner has filed a traverse. For the reasons set forth below, the petition will be denied.

## I. PROCEDURAL HISTORY

      On January 8, 2010, a Santa Clara County jury found petitioner guilty of active participation in a criminal street gang, in violation of California Penal Code section 182.22(a). 2CT 438; 16RT 3971-72.[1] Petitioner admitted four prior strike convictions, one prior serious felony conviction, and two prior prison terms. 2CT 439; 16RT 3982-87. After striking one of the prior convictions, the trial court sentenced petitioner to 25 years to life consecutive to 7 years as follows. 3CT 810-13; 18RT 4575-79. He was sentenced to 25 years to life for participating in a street gang, with an additional 5-year term pursuant to penal code section 667(a) and 2 additional

---

[1] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer, unless otherwise indicated. 2CT 438 refers to the Clerk's Transcript, Volume 2, page 438 The Court will use a similar citation form for other references to the Clerk's Transcript and to the Reporter's Transcript ("RT").

years pursuant to penal code section 667.5.  *Id.*[2]

On October 29, 2014, the California Court of Appeal affirmed the judgment in an unpublished decision.  Ex. 7.  On January 28, 2015, the California Supreme Court denied review.  Ex. 9.  Petitioner did not pursue state collateral review.  The instant petition was filed on November 10, 2015.

## II. STATEMENT OF FACTS

The following background facts describing the crime and proceedings at trial are from the October 29, 2014 opinion of the California Court of Appeal.[3]

*Expert witnesses*

A number of witnesses testified as experts at trial.  Sergeant Dan Livingston, the investigation supervisor in the special enforcement division of the Campbell Police Department, testified as an expert on the organization and structure, operation, activities, rules and procedures, members and associates, and culture of the Nuestra Familia (NF) organization.  Officer Dennis Gillotte was working for the Santa Clara County Department of Correction in the intelligence unit of the classification division at the time of trial and he testified as an expert with respect to the activities and organization of the NF organization within the Santa Clara County jail.  Criminologist John Bourke, a supervising criminologist with the Santa Clara County Crime Laboratory, was recognized as an expert in handwriting analysis.

Former members of the NF organization, members of either NF or Nuestra Raza (NR), were called as witnesses by the prosecution. Witnesses Chris Klipp and Joseph Abeyta each testified he was a former NR member.  Sammy Ramirez testified he was a former NF member, category two and John Mendoza testified he was a former NF member, category three. They were recognized as experts in the organization, structure, and operation of the NF organization.  [FN 2]

_____

[2] The term was to be served consecutively to petitioner's sentence in another case, Santa Clara County Case No. 211208.  In that earlier case, petitioner had been convicted, following jury trial, of actively participating in a criminal street gang and conspiring to sell methamphetamine for the benefit of a criminal street gang.  The convictions were later reversed by the California Court of Appeal in part on the ground that the trial court had admitted unduly prejudicial gang evidence.  *See* dkt. no. 18.  Specifically, the court found that the testimony of gang expert Sergeant Livingston—who also served as one of the prosecution's gang experts in the underlying case— was excessive and inflammatory in its discussion of the gang's violent activities, which had almost no connection to the charges at issue.  *See id.*

[3] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017).  Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004), unless otherwise indicated in this order.

FN 2: Klipp and Abeyta testified under a grant of immunity. Klipp went into protective custody on November 7, 2008. Abeyta went into protective custody in April 2009.

The evidence reviewed under the proper standard showed the following.

*The NF Organization*

NF developed as a rival Hispanic gang of the Mexican Mafia and primarily operates in Northern California. The NF organization is highly structured, regimental, and hierarchical. The NF organization encompasses NF members, NR, a group subordinate to NF, and northerners in street regiments or gangs.

NF members constitute the top tier of NF organization. NR members are the second tier. In more recent times, NF has referred to NR members as "Nortenos," which means northerners in Spanish, or "Hermanos," which means brothers in Spanish. [FN 3] The next tier includes the Northern California street gang members who have not reached the status of NR or NF members. NF refers to them as northerners. The NF organization also has associates who help it, such as by stashing weapons or drugs, laundering money, or facilitating communications.

FN 3: For the sake of clarity, we will still refer to NR members. The word "Norteños" is sometimes used to refer to Hispanic gangs generally originating in Northern California whose enemies are Sureños, Hispanic gangs generally located in Southern California. The evidence at trial indicated that the NF now uses the word "northerner" in English to refer to any northern Hispanic street gang member and it has reserved the term "Norteños" for the group previously known as NR and prohibited common street gang members from referring to themselves as Norteños.

Three generals, each with different responsibilities, are at the top of the NF organization's command structure. NF's council includes "the generals plus some trusted advisors, high-ranking NF members," who were elected to their positions. The "inner council" advises the NF generals. In 2007, it had five to seven members. The governing constitution, "a very detailed document," specifies the decisions that must go to the council for a vote and the responsibilities of the inner council and the generals.

One NF general is in charge of the streets, a second general is in charge of prisons, and a third general is responsible for conducting internal investigations of particular NF members or a conflict between members. The general in charge of the streets oversees street regiments and communicates with the regimental commanders and makes sure that they follow the directives or policies he sets.

At the time of trial, one of the reputed generals operating out of Pelican Bay State Prison was Antonio Guillan, an NF member from San Jose whose moniker was Chuco. Guillan was the general in charge of street operations and regiments. Guillan oversaw San Jose's street regiments and controlled the NF organization in Santa Clara County. The general was "kept apprised" of parolees being released to the streets so he could "assign manpower to certain areas" or send parolees "to function with different street regiments." His authority could not be questioned and his directives had to be followed.

NF's current constitution basically provides that its leadership will be located in Pelican Bay State Prison. Under the constitution, the organization comes before anything else; family is second. Women are regarded "more like property" and they cannot be NF members. There are "14 bonds" that constitute NF's policies; an NF member is required to memorize them and is held accountable for them. One of those bonds mandates "no cowardice [when] dealing with police officers" and no traitors. The inner council and the generals constitute the top leadership of NF and NF controls NR and northerners on the streets.

NF members are ranked by category from one to three, the highest status. Mendoza estimated that, in 2007, there were perhaps 15 to 20 NF members in category three statewide and 100 to 200 NF members in the lower two categories statewide. Sergeant Livingston testified that there are about 20 to 30 category-three NF members at any given time. He estimated there were roughly 200 to 300 NF members.

NF members in all categories are expected to be familiar with NF's constitution, bonds, organization and structure, and activities. To become a member of NF, a person must be sponsored by at least one existing NF member and voted in.

Category one is the entry level for NF membership but even category-one members are "extremely seasoned, experienced gang members." The category-one stage of NF membership is a period of "induction" and "indoctrination." It is a time to study NF's constitution and gain a better understanding of a member's obligations to the organization. A category-two member can educate and train other NF members. A category-three NF member must have been in the NF organization for at least 10 years, be well educated in NF's philosophies and principles, and be completely committed to the organization.

NR is a subsidiary group and is subordinate to NF; NR members number in the thousands. Although NF reasserted itself over NR some time ago and stripped its name, many NR members were still identifying themselves by that name in 2007. To become an NR member, a person must be sponsored by an NF member.

NF and NR members are well-educated about the NF organization's history and its activities and their responsibilities to the organization. A member goes through many months or years of training. The former NF or NR members who testified at trial had gone through an indoctrination process and moved up in the NF organization while in prison.

In prison, NF members are segregated from the general population in higher security housing. NR members in a prison's main line (the general inmate population) are NF's eyes, ears, and arms. NR members try to be placed in the main line of Pelican Bay so that NR can reach a broader prison population and bring more people into the NF organization.

When a person becomes a member of NF or NR, the person understands that he may have to kill for the organization. The NF phrase "blood in," "blood out" means that an NF or NR member must be willing to spill the blood of anyone who is an enemy of the organization and may be required to spill his own blood.

NF's street regiments are supposed to generate money for NF. The NF general in charge

4

of street operations and regiments might assign a parolee being released to a street regiment. When Mendoza was released on parole in 1999, he left with instructions to establish a regiment in Mendocino County, where he was being released.

But not all northerner street gangs, especially first generation gangs, are involved with NF on the streets. Once a northerner gang member is taken into custody, however, he is under NF's umbrella. Someone without any former gang association who goes into custody and chooses to align with the NF organization and act on its behalf will be considered a northerner as well. In a county jail or prison, northerners are educated by members of the NF organization.

NF holds power in jails and prisons. Generally, a northerner in custody must "function with" the NF organization or go into protective custody to avoid "removal," which is a targeted assault.

While in prison and before becoming an NR member, Klipp began assisting the NF organization by doing such things as holding contraband or performing assaults of persons not in good standing. A removal order would reach him through the chain of command, either verbally or in writing. Klipp executed three removal orders. He accomplished two removals with his hands and the third time he cut the victim's face with a razor blade. A gang member who refuses to obey a removal order is removed himself.

While he was an NR member in prison, Abeyta received a removal order to remove or assault his own cellmate. Even though Abeyta liked his cellmate and they were "pretty tight," Abeyta did it because he had to.

Even the testifying defense expert acknowledged the discipline within the NF organization was top-down. In his opinion, a subordinate had no right to decline to perform an instruction given by a superior. He indicated that if a subordinate did not comply with a superior's order, the subordinate risked his life. He stated that discipline in the NF organization was "everything."

*Santa Clara County Jail*

The NF organization has a structured chain of command in the Santa Clara County jail (the jail). The NF organization refers to the top NF authority in the jail as the overall authority (OA) or, sometimes, the "regimental commander." The jail's OA sets the policies for the jail. He decides who is in charge of a particular section of the jail and whether there should be a change of command. The jail's OA decides whether a "hit" or "removal" should be done. Lorenzo Guzman, an NF member whose moniker is Lencho, was the jail's OA at the time of trial and he had been the OA since 2007.

Usually, there is a second in command, another NF member or seasoned NR member who handles lesser, day-to-day decisions and serves as a "buffer" to protect the identity of the jail's OA. Underneath the jail's OA in the command structure are the individuals in each section or unit of the jail, variously called the "building channel" or "block channel" (BC) or the "overall authority" of that area. Ordinarily, an NR member in custody in a particular area of the jail will have authority over the northerners housed there. If an NF member is also present in that area, typically the NF member would enjoy greater authority than any

NR member.

Each pod within a unit of the jail generally has an inmate serving as "tier security," who handles day-to-day matters and sensitive paperwork, and reports to the BC. A "pod" is a block of cells. The jail's fourth floor has three units, 4A, 4B, and 4C. 4B and 4C are each divided into three pods, each containing 16 cells. 4A of the jail is a less secure area than 4B and 4C, which are maximum security areas. 4A is not divided into pods and contains 48 cells. Inmates in 4B and 4C are allowed out of their cells one at a time for one hour every other day. In contrast, an inmate in 4A is allowed out of his cell at various times each day and may interact with other inmates in an open environment.

The person holding the position of tier security initiates contact with a new inmate entering his area of the jail. Another function of tier security is to inventory weapons, including razor blades, which would be used for removals and assaults. Tier security keeps track of scheduled court dates for inmates in his pod.

While Klipp was the tier security of 4C following his arrest in August 2008, his job included noting suspicious activities, making sure other inmates carried out their responsibilities, and collecting inmates' written reports. For example, Klipp would report any suspicious inmate communications with officers and any information provided by inmates who went out of the pod for any reason and were required to report to him whatever they saw. Klipp made his reports on "kites." A "kite" is a communication written in very tiny letters, "micro writing," on a small piece or strip of paper. Kites were also passed through Klipp and he was responsible for holding them and passing them on, along with his weekly reports, to his BC, who in turn would pass them on to OA Guzman. It was Klipp's responsibility to be familiar with the reports coming from inmates in his pod but it was not his business to look at kites not intended for him.

In general, information of concern to the NF organization is passed up the chain of command to the jail's OA. Directives are sent down the chain.

If there is not a qualified NR member, a northerner may be asked to act as the tier security or a BC.

*Kites*

On a kite, as many as five handwritten lines fit within the space of a single line of lined, yellow paper. A kite is sometimes called a "filter." Messages are sent and conversations are carried on in kites; code words are used.

Kites are generally rolled up and covered in something like plastic wrap so that they can be concealed on a person's body or in clothing. Kites are secreted in a person's mouth, nose, or rectum.

Secretive communications are passed on kites up and down the chain of command in the jail hierarchy. Kites are "used heavily" within county jails and prisons and kites are passed between those institutions and out to the NF organization's leadership in the streets. Messages may move indirectly through different jail units until the messages reach their destination in the jail, which may take some time, perhaps days or months.

The person in the position of tier security is responsible for possession of kites. Klipp explained that kites are passed on a "personal basis" to individuals believed to be trustworthy. They are usually passed when someone goes to court but sometimes through jail visits. A kite is transferred in the court's holding tank and the recipient either puts it in his mouth or "keester[s] it," which means putting it in his rectum.

*New Arrivals*

Upon entering custody in a particular area of the jail, a Hispanic new arrival (NA) is required by the NF organization to provide specific information and all his paperwork, including police reports. The pagination of the police report may be checked to make sure the NA is not withholding any pages. The police report discloses the circumstances of arrest and whether the suspect cooperated with law enforcement or made negative or incriminating statements against fellow gang members. The NA is thoroughly questioned and information is also gathered from others to identify the individual and decide whether he should be cleared and allowed to participate in the organization. The NF organization wants to make sure important information is not disclosed to traitors or informants.

An NA is asked for basic information, including, for example, his name, his date of birth, his aka, where he is coming from, his PFN (personal filing number), his booking number (CEN), his neighborhood, and his street gang. Information, good or bad, about the newcomer is gathered by filter from the "manpower," persons in the NF organization. A person acting as tier security may conduct in-depth questioning to find out more information, such as any CDC number, prison history, and status in the NF organization.

Officer Gillotte had found kites containing written questions on multiple occasions, either hidden in personal belongings in a jail dorm or on an inmate. The questionnaires asked for general information, including name, PFN, booking number, current charges, prison history, tattoos, gang affiliation and neighborhood. If an NA does not comply with such a questionnaire, the inmate will be viewed as going against gang rules and put himself in danger of being assaulted.

*"On Freeze"*

An NA, regardless of status within the NF organization, is placed "on freeze," which means he is on hold and has no right to intervene in the NF organization's business until he is cleared. Ordinarily, an NA has no access to any NF information, such as who in the organization currently holds authority in the jail or whom is going to be "hit."

A person on freeze ordinarily cannot hold any position of authority within the organization in the jail, such as tier security, BC, or OA. An NF member who is on freeze might nevertheless hold a lot of weight in a section of the jail if he is the most experienced gang member and other northerners might rely on him and he might "step up and do things that he thinks he's supposed to do."

An inmate on freeze may still be asked to assist the NF organization. If an inmate on freeze is assigned to an area out of communication with the jail's OA, he has an obligation to initiate contact with the OA, especially if the person is an NF or NR member. An inmate on freeze in such an area may still take the initiative and try to get his section "in

line with the OA."

*Rosters*

Every part of the jail is required to submit weekly rosters and file incident reports with the jail's OA. A basic roster contains personal information regarding the manpower housed in a specific area of the jail. It provides complete identifying information regarding those individuals and permits the NF organization to keep tabs on them. Rosters generally contain inmates' court dates, which are important for passing information from one inmate to another.

Rosters are sent up the chain of command to the jail's OA. Rosters enable secretive communications by the NF organization within the jail, which assist in the commission of felonies within the jail. A roster plays an important role in creating a strong and effective organization in all parts of jail, which in turn makes it easier to do removals and extort money. Sergeant Livingston confirmed that, in general, rosters "facilitate, promote, further, [and] assist" in the NF organization's "felonious criminal conduct."

Individuals listed on a manpower roster may be compared to a "bad news list" (BNL), which is a list of people in bad standing with the NF organization. The jail's OA decides whether action will be taken against anyone listed on a roster.

A roster may be used to select someone for a position of authority in the NF organization within the jail or to make an assignment, including the job of doing a removal. A roster is essential to accomplishing a removal. If the jail's OA determines that an individual must be removed, he knows, based on the roster, where that individual is located and where the removal order should be sent within the jail. Birthdays are included in rosters and the master BNL to make sure the correct person is identified, otherwise someone innocent with the same name might be "hit" by mistake. The roster's personal information allows the OA to correctly identify and target the person in bad standing. Knowledge of inmates' next court dates, which are reported in a manpower roster, facilitate the passing of a removal order.

An "educated person" who participates in the chain of command of the NF organization in the jail understands why rosters are needed.

*Bad News List*

A person may be on a BNL because he is an informant, he owes a fine to NF, or he is otherwise "deemed no good." A person who drops out of the NF organization and cooperates with law enforcement becomes an enemy of the organization. Dropouts may be put on a BNL. If someone goes into protective custody, he is going to be put on a BNL.

The punishment for being on the BNL ranges from physical assault to murder. Dropouts are sometimes attacked and severely injured or killed. In Sergeant Livingston's opinion, there is an ongoing effort to commit crimes against incoming inmates who are in bad standing with the NF organization.

Even if a NA has been cleared within his unit and his name is on a roster, he may still be checked against the names on the OA's BNL. When Mendoza was the jail's OA, it was

8

his responsibility to compare rosters to a master BNL on a weekly basis. A BNL is regularly updated. The BNL available in the NA's section of the jail might be out of date. An updated BNL may leave a state prison with an inmate who secrets it in his rectum and goes to court or is released on parole and then may make its way to a county jail.

*Removals*

A person may be ordered removed because he was on a BNL, he owed money to NF, or he committed some other wrongdoing, such as child molesting. It is part of the responsibility of an OA of a facility, either a jail or a prison, to order removals. The jail's OA does not need to obtain the approval from higher-ups in Pelican Bay before ordering the removal of a person who is not on a BNL. Persons active in, or associates of, the NF organization housed in the unit of a targeted person are selected to carry out a removal directive. A removal order from the jail's OA controls even if the targeted individual was previously cleared.

Removals are an ongoing activity required to keep the NF organization's structure strong in the county jail. "[T]aking care of security" in the NF organization is "synonymous with doing removals."

When Mendoza was the jail's OA from about 2004 until late 2005, Mendoza's policy was that removals were done with weapons because that was NF's way to do it. [FN 4] A removal takes a person permanently out of the NF organization and identifies the person as a traitor.

> FN 4: Under Abeyta, who was very briefly the jail's OA, removals were done with hands.

In 2007, Guzman took over as the jail's OA. Guzman's established policy was that removals had to be done with a weapon, ordinarily a razor blade. A removal ordered by the NF organization in the jail is typically orchestrated so that an initial assailant quickly slices the targeted victim's face with a razor blade, cutting him from the corner of the mouth, across the cheek, and up toward the ear. Immediately other attackers assault the victim with hands and feet, which allows the initial assailant time to dispose of his weapon. If an officer notices the altercation, he sees only a fist fight. The resulting scar of such a removal is called a zipper, a smiling face, or a "puto mark," which means the person is marked as a piece of trash.

The parties stipulated that members of the NF organization "authorized and committed an assault using a razor blade against Joel Madrigal in 2007 and Isaac Lastra in 2008." Madrigal's face was sliced in about February 2007. Isaac Lastra's face was sliced in about September 2008; his injury ran from his ear to his mouth. Their injuries were the type typically inflicted by the NF organization on individuals in bad standing.

At the time of trial, Abeyta had been in the jail continuously since 2003. An order from OA Guzman requiring the removal of the Lastra brothers, David and Isaac, was delivered to Abeyta through somebody else in Abeyta's pod. By the time the removal order was received by Abeyta, David Lastra had already been moved from the pod across from Abeyta to the seventh floor so Abeyta "sent word to the seventh floor," through a filter

passed at court, that David Lastra was to be removed. Abeyta also ordered the removal of Isaac Lastra. Abeyta did as he was told because otherwise he would be in trouble himself. At some point later, Abeyta heard that the removals were ordered because David Lastra had "messed with" the underage stepdaughter of an NF member and Isaac Lastra was behind in paying money. When Abeyta was an NR member, he followed orders whether he liked them or not because not following orders had serious consequences.

Even northerners can be asked to do removals. If a person in the NF organization receives an order to remove someone, he has no right to refuse to follow it. A person who fails to comply with a removal order may be stabbed, sliced or stomped.

If an inmate is assaulted in the jail, he will be moved out of his housing unit for his own protection.

*Extortion*

An inmate on a roster might owe a fine, he might have been in trouble and "owe clean-up," or he might owe a debt to NF for drugs, such as methamphetamine, supplied to him. Threats of removal or force may be used to get an inmate to pay money owed to NF.

While the jail's OA, Abeyta had telephone contact with Mendoza, whom Abeyta knew from Pelican Bay. Abeyta asked Mendoza, who was an NF member, for help clearing a northerner in custody from the BNL. The inmate was still trying to function with the NF organization and Abeyta believed the inmate should be removed from the BNL because he had never been to prison and learned the bonds and he had been misled by others into stabbing an NR member. Even as the jail's OA, Abeyta did not have the authority within the NF organization to take someone off the BNL. The NF organization determined that the inmate would be charged $3,000 to be cleared from the BNL. His choice was to pay or be assaulted. The inmate paid and he was taken off the BNL. Abeyta sent out "a filter to all sections" to leave the inmate alone.

Mendoza testified that, when he was the jail's OA, he tried, through a BC or tier security, to get debtors to pay up. He would require a report explaining why the money had not been paid and try to obtain arrangements for payment. The debtor would be told that if he did not pay by the deadline, he would be removed and there would be "serious repercussions."

*Kites Written by Paigly*

On November 7, 2008, Klipp was placed into protective custody in the jail. That day, two bindles of kites wrapped in plastic were retrieved from Klipp, who had been concealing them in his rectum or "keester." On a subsequent day, Klipp retrieved a third bindle of kites and gave it to an officer.

Klipp, who had been serving as tier security of pod one of section 4C, had been responsible for holding kites and providing a weekly report in a kite to his BC. Klipp was supposed to have given the kites in his possession to his BC.

Two of the kites recovered from Klipp had been written by Paigly. One kite was clearly the kind of roster that was expected to be provided to the OA on a weekly basis and

identified the manpower. This kite contained inmates' names and all the vital personal information commonly provided in a roster ("roster kite").

The roster kite listed the "overall manpower" in section 4A of the jail. It contained 27 inmates' names. The official housing records of inmates housed in section 4A show that, on November 1, 2008, approximately 57 persons were housed in 4A and all 27 of the names on the roster were inmates housed in section 4A. The balance, approximately 30 inmates, were not affiliated with the NF organization.

Each name on the roster was accompanied by identifying information. The roster specified an inmate's moniker or aka, his gang affiliation, his birth date, any CDC number, his PFN (personal filing number), booking number (CEN), criminal charges, tier name (new moniker), type of housing (such as "GP," which stands for general population), and his next court date (abbreviated to "NCD"). The roster referenced multiple street gangs.

Paigly included himself on the roster, which reported his moniker as "Lil Locs." Paigly has "Lil Locs" tattooed above his right eye and he has a "Locs" tattoo on his right wrist. The roster also included Felix Medina, whose moniker was reported as "Shorty."

The other kite written by Paigly was a message concerning the running of unit 4A in the jail ("message kite"). It read as follows:

"To: Capolli....[FN 5]

  FN 5: Dots are in original and do not indicate an omission of words.

"Fr. Coatl....

"Re: 4A. Concern/Breif [sic] Report ...

"DT: 11.1.08....

"Saludos ... First and foremost allow us to extend our utmost love and profound respect with a warriors embrace .....

"Sir today I come before you to address the current status of his house hold [sic] and its activities here in ......

"This missive is made in duplicate as to have a better chance in succeeding in touching down for as you stated you have not heard from this unit in 6 months ...

"I concur with it being unacceptable ......

"Thus explaining the necessity of this missive....

"Now sir I 'Jeremy Paigly' 'Lil Locs' D/WSSJ was appointed 'B.C.' by 'Chino' D/VSJ in early Oct. upon Paul Elemen 'Huero' D/EHP departure to the pitts ...

"And during my tenure this casa has been running smoothly.... All H.H.M.s are abiding and honering [sic ] to all rules/regulations/policies etc....

"With the exception of minor issues that were resolved in the form of D/P/Correction and

11

enlightenment as to be expected ......

"There was one major issue that delt [sic ] with 'Chino' relieving 'Mikio' Micheal [sic ] Washington of the O.A. position for abuse of authority that occurred before 'Chino's' departure to 7.C ... To which I/Rs have been written in which we still possess and with the failed attempt to get to you we still try along with a bundle that was left by 'Huero'....

"Now Sir ... Im [sic ] not here to question you or your decisions ... but the appointment of Felix Medina 'Shorty' as the authority here is unbefitting for the following....

"Not only does he lack the education and experience and training ... his conduct and actions are not that of a[n] authority figure .... we ask for the authority to make the appropriate change to someone with more experience ... in order to better facilitate the functions here in .....

"I write this missive after approval and after Mr. 'Shorty' review .....

"If your decision/wishes remain then we will strive forward as always and I will give my all to aid and assist. .... So now on that note allow me to humbly excuse myself with honor, loyalty and carnalismo ...

"Con mucho respects

"F.N. Also enclosed is a current and updated roster as of 11 1 08

"Forever Forward"

F.N. Due to present & resent [sic] circumstances it is to our understanding .. Callpoli has been relocated .. Please advise as to where to direct our mail ... Gracias ..."

The message kite was addressed to "Capolli" and dated November 1, 2008. "Capolli" was a code name that referred to section 4B of the jail. The code was deduced based partially on the volume of kites going into the area, the fact that Guzman was housed in 4B, and Guzman's status within the NF organization. In the latter part of 2008, Guzman was the reported OA for the NF organization in the jail and he was housed in 4B. Guzman was moved out of 4B in early November of 2008.

In Sergeant Livingston's opinion, although the message kite was dated November 1, 2008, the footnote, inquiring where to send mail since "Callpoli" had been relocated, was a postscript added after Guzman was moved and before Klipp possessed it on November 7, 2008. In the sergeant's opinion, the reference to "Callpoli" was to Guzman.

The message kite was purportedly from "Coatl." Sergeant Livingston testified that the Aztec language is sometimes used in kites. Also, code names are used for the sender as well as the recipient of a kite. In the body of the message, Paigly identified himself as the author by his name and moniker. It could reasonably be inferred from the evidence, including the content of the message kite and the testimony of the handwriting expert, that Paigly had written both kites.

The message kite's opening salutation and introduction were very common. "First and foremost" was a phrase that was almost always used.

12

In the kite, Paigly claimed to have been appointed to the position of "BC," an abbreviation used for building or block channel, after someone's "departure to the pitts." An area of the old jail is called the "snake pits." The appointing and departing parties were identified by name, moniker, and gang abbreviation. "D/VSJ" means from Varrio San Jose and "D/EHP" means from El Hoya Palmas.

The term "household" or casa, a Spanish word for house, refers to an area of the jail, such as 4A. The term "HHM's" refers to household members. "D/P" means discipline. When a northerner is disciplined for a minor infraction, he may be forced to do a rigorous physical workout, such as burpees, or required to write a 5,000 word essay.

The abbreviation "I/Rs" means incident reports. Every part of the jail is supposed to submit incident reports in addition to weekly rosters. The message kite indicated that Paigly was enclosing "a current and updated roster as of 11 1 08." A "bundle" refers to a bundle of kites.

The jail's OA would expect to occasionally see a report from someone who wants to address the activities occurring in a particular section of the jail. A duplicate kite might be written and sent in different ways if there had been trouble delivering reports.

"Carnal" means brother in Spanish. "C's" or "carnals" refers to NF organization members. The term "carnalismo" is commonly used among NR members and means something like brotherhood. "Forever forward" is a common phrase meaning pushing forward and staying loyal.

In the message kite, Paigly criticized "Shorty" and reported that he had written the kite "after approval and after Mr. 'Shorty' review...." The jail's OA was the only person with the authority to remove someone from his organizational position within the jail.

The kite conveyed that Paigly would abide by the decision of the jail's OA and expressed his continued commitment to the NF organization.

*Paigly's Interaction with Ramirez*

After Paigly was moved from 4A to Ramirez's pod in 4C, Ramirez came into contact with Paigly. Although Ramirez was on freeze, Paigly and he had a conversation about the NF organization. It was Ramirez's assessment that Paigly's "heart was in the right place but he still needed a lot of work," "seasoning," and education. Ramirez's opinion was based on experience recruiting NF and NR members "into the struggle" while he was in Pelican Bay.

During a conversation, Paigly admitted to Ramirez that he had passed kites to Klipp. Paigly believed he had been moved from 4A to 4C because he was going to be charged with a gang enhancement related to the kites that had been turned over to authorities by Klipp. It was common knowledge in 4C that Klipp had "locked it up" or was under protective custody. Ramirez received photocopies of the kites during discovery in his own criminal case and he showed them to Paigly.

13

Paigly explained to Ramirez that he wrote the kites to Guzman because of the chaos in 4A. Paigly indicated that he was trying to get 4A organized and "trying to do his best to hopefully get the manpower on track." Paigly was asking for permission from Guzman to "correct some wrongs" that were occurring in 4A and attempting to become the overall authority for 4A. Paigly indicated that he had thought he could do a better job than the person currently in charge. Paigly indicated that he had been attempting to help the NF organization by sending the kites.

*Paigly's Status and Participation in the NF Organization*

Sergeant Livingston testified that Paigly had been the second in command of the street regiment run by James Cramer, an NF member. The principal activity of the regiment was sales of methamphetamine. By September 2007, a number of that regiment's members had been arrested and the regiment was essentially defunct. In about November 2007, Paigly was taken into custody.

On October 2, 2008, in case No. 211208, Paigly was convicted of a number of crimes, including (1) conspiring to violate Health and Safety Code section 11379 (sale of methamphetamine) on or about and between September 1, 2006 through October 30, 2007, (2) active participation in a criminal street gang (§ 186.22, subd. (a)) on or about and between October 1, 2006 and October 30, 2007, (3) violating Health and Safety Code section 11378 (possession for sale of methamphetamine) on or about January 26, 2007, and (4) violating Health and Safety Code section 11379 (transportation of methamphetamine) on or about January 26, 2007. [FN 6] Gang enhancement allegations attached to the conspiracy conviction and the Health and Safety Code violations were found true (see § 186.22, subd. (b)(1)(A)).

> FN 6: The indictment in that case named many defendants, including Cramer and Paigly.

Sergeant Livingston testified that, in case No. 211208, he had testified as an expert and described in great detail the criminal activities of the NF organization in state prison and the jail. He testified that his prior testimony covered removals done by the NF organization and the means and methods of such removals, the use of kites, and rosters. Livingston testified that Mendoza had previously testified in case No. 211208 regarding NF's extortion of inmates and NF's use of weapons in removals. According to Livingston, Mendoza testified regarding NF's methods of communication, including kites, and he testified in detail how kites facilitate the criminal conduct of the NF organization. Paigly was present for all that testimony.

Sergeant Livingston had testified in that prior case that Paigly was a member of NR. It was still Sergeant Livingston's opinion that Pagily was an NR member during the period of September 2006 through October 30, 2007.

In the present case, Sergeant Livingston testified to his opinion that Paigly was still an NR member. Livingston based his belief partly on the investigations in both the present and prior cases and on Paigly's tattoos. Sergeant Livingston had no information that defendant Paigly dropped out of NR during the prior prosecution or after return of the verdict in that case.

Sergeant Livingston had heard that NF had put Paigly on freeze and stripped his status. If section 4A were out of communication with the jail's OA, even an NR or NF member "on freeze" in 4A would remain obligated to communicate with the OA.

When an NF member is "stripped of status," it means the person has gotten into "some type of trouble" and he cannot function as a full member or hold a position of authority while the matter is investigated and until he is cleared. In the sergeant's opinion, Paigly did not accept any such decision to strip him of status and Paigly "tried to step up" because he is very motivated and "always tries to get actively involved...."

It was Livingston's opinion that Paigly was actively involved in the NF organization in November 2008. In Livingston's opinion, Paigly chose to actively participate in the NF organization in jail by compiling a roster of 27 names and sending two kites to the jail's OA. Livingston found it significant that, in the message kite, Paigly identified himself as the BC and expressed his allegiance to the organization.

In Ramirez's opinion, sending a kite, holding a position of authority like BC, and sending requests up the chain of command concerning the performance of others in the structure were consistent with a person actively involved in the NF organization. As far as Ramirez knew, Paigly had never sought protective custody while in the jail.

*People v. Paigly*, No. H035692, 2014 WL 5468944, at *3-14 (Cal. Ct. App. Oct. 29, 2014).

## III. DISCUSSION

### A.    Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the

jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review. The California Court of Appeal, in its opinion on direct review, addressed the claim petitioner raises in the instant petition. The court of appeal thus was the highest state court to have reviewed petitioner's claims in a reasoned decision, and it is the court of appeal's decision that this Court reviews herein. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

**B.     Petitioner's Claim**

Petitioner claims that the evidence was insufficient to establish the intent element of conspiracy and, consequently, the third requirement of the substantive gang offense pursuant to

California Penal Code section 186.22(a).  Petitioner does not deny that he authored the kites and

does not challenge the sufficiency of the evidence as to the other elements of the substantive gang

offense.  The court of appeal set forth the applicable legal principles underlying the criminal street

gang statute as follows:

> At the time of the offense charged in this case, section 186.22, subdivision (a), stated:
> "Any person who actively participates in any criminal street gang with knowledge that its
> members engage in or have engaged in a pattern of criminal gang activity, and who
> *willfully promotes, furthers, or assists in any felonious criminal conduct by members of
> that gang, shall be punished....*" (Stats. 2006, ch. 596, § 1, p. 4929, italics added.)  The
> crime of active gang participation has three elements: "(1) active participation in a criminal
> street gang, in the sense of participation that is more than nominal or passive; (2)
> knowledge that the gang's members engage in or have engaged in a pattern of criminal
> gang activity; and (3) the willful promotion, furtherance, or assistance in any felonious
> criminal conduct by members of that gang.  (*People v. Lamas* (2007) 42 Cal.4th 516, 523
> [67 Cal.Rptr.3d 179, 169 P.3d 102].)" (*People v. Albillar* (2010) 51 Cal.4th 47, 56
> (*Albillar*).)  As emphasized by defendant, "[m]ere active and knowing participation in a
> criminal street gang is not a crime." (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1130
> (*Rodriguez*).)  "Applying the third element of section 186.22[, subdivision] (a), a defendant
> may be convicted of the crime of gang participation only if he also willfully does an act
> that 'promotes, furthers, or assists in any felonious criminal conduct by members of that
> gang.' (§ 186.22[, subd.] (a).)" (*Ibid.*)
>
> "As [the Supreme Court] observed in *Albillar*, ... section 186.22 [, subdivision] (a), unlike
> the gang enhancement in section 186.22 [, subdivision] (b)(1), does not require a specific
> intent to further or promote the gang (only knowledge of the gang's pattern of criminal
> activity).  (*Albillar, supra*, 51 Cal.4th at p. 56....)" (*Rodriguez, supra*, 55 Cal.4th at pp.
> 1134-1135.)  "It is established ... that one need not have the specific intent to promote,
> further, or benefit the gang to violate section 186.22[, subdivision] (a), nor must one
> commit a gang-related felony." (*Id.* at p. 1135.)
>
> In *Rodriguez, supra*, 55 Cal.4th 1125, the Supreme Court observed: "Nothing in the
> language of section 186.22[, subdivision] (a) would suggest that one may not promote,
> further, or assist 'in any felonious criminal conduct by members of that gang' by either
> aiding and abetting other gang members in committing a felony or by directly committing
> a felony with other gang members." (*Id.* at pp. 1135-1136.)  In this case, the prosecutor
> contended that Paigly directly committed a felony, namely conspiracy, with other gang
> members.
>
> Under section 182, subdivision (a)(1), " '[a] conviction of conspiracy requires proof that
> the defendant and another person had the specific intent to agree or conspire to commit an
> offense, as well as the specific intent to commit the elements of that offense, together with
> proof of the commission of an overt act "by one or more of the parties to such agreement"
> in furtherance of the conspiracy.' (*People v. Morante* (1999) 20 Cal.4th 403, 416 ...; see
> § 184; see also *People v. Homick* (2012) 55 Cal.4th 816, 870....)" (*People v. Johnson*
> (2013) 57 Cal.4th 250, 257.)  In other words, "a conspiracy requires an intentional

agreement to commit the offense, a specific intent that one or more conspirators will commit the elements of that offense, and an overt act in furtherance of the conspiracy. ( [*People v.*] *Morante*, *supra*, 20 Cal.4th at p. 416....)" (*Id.* at p. 266.) Thus, to prove in this case that Paigly committed the crime of conspiracy, the People were required to prove that Paigly had the specific intent to agree to commit an offense, either extortion or assault with a deadly weapon or by force likely to produce great bodily injury, and the specific intent to commit the elements of the offense that was the object of the conspiracy.

" 'Evidence is sufficient to prove a conspiracy to commit a crime "if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135 ...; see *People v. Homick* (2012) 55 Cal.4th 816, 870 ... [the element of agreeing to commit a crime 'must often be proved circumstantially'].)" (*People v. Maciel* (2013) 57 Cal.4th 482, 515-516.) The intent elements "may be established through circumstantial evidence. (*People v. Herrera* (2000) 83 Cal.App.4th 46, 64....)" (*People v. Bogan* (2007) 152 Cal.App.4th 1070, 1074.)

*People v. Paigly*, 2014 WL 5468944, at *2.

The court of appeal proceeded to reject petitioner's claim as follows:

"A conspiracy can generally be established only by circumstantial evidence." (*People v. Robinson* (1954) 43 Cal.2d 132, 136.) "Evidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime. [Citation.] The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' (*People v. Cooks*, *supra*, 141 Cal.App.3d at p. 311....)" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135.) "[T]he existence and nature of the relationship among the conspirators is undoubtedly relevant to whether such agreement [to commit a crime] was formed, particularly since such agreement must often be proved circumstantially." (*People v. Homick* (2012) 55 Cal.4th 816, 870.)

"Regarding a specific intent element of a crime, [the Supreme Court has] explained that '[e]vidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction.' (*People v. Bloom* (1989) 48 Cal.3d 1194, 1208....)" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) "The jury may infer a defendant's specific intent to commit a crime from all of the facts and circumstances shown by the evidence. [Citation.]" (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

In this case, the evidence was sufficient to show that Paigly authored and hand-wrote the message kite and the roster kite. The inference that Paigly was an experienced gang member could be drawn from the evidence that he held the number two position in Cramer's street regiment and he had reached the level of an NR member within the NF organization. A trier of fact could reasonably infer from Paigly's writing and sending of those kites and their contents, considered in the light of the other evidence regarding his status in the NF organization, that Paigly was intimately familiar with the structure,

organization, operation, procedures and protocols of the NF organization in the jail and Paigly chose to be an active participant in the organization.

It may be inferred from the language of the message kite and the sending of the roster of northerners in 4A that Paigly was fully aware of the structure and operation of the NF organization in the jail and he was willing to obey the directives and orders handed down by the higher authority of the NF organization within the jail. Once he was moved to a pod in 4C after the authorities had obtained the kites, Paigly sought the advice of Ramirez, who had advanced to a category-two NF member and also had been an NR member. This evidence buttresses the inference that Paigly was actively seeking to be an active participant in the NF organization.

A trier of fact could reasonably infer that, when Paigly authored the kites and when he passed them on, Paigly had a special interest in protecting the jail's NF organization of which he was a part. The evidence supported the inferences that removal was a standard practice of the NF organization, the NF organization maintained its hegemony by removing persons in bad standing within the organization, and, under OA Guzman, removals were performed by slicing the victim's face with a razor and then assaulting the victim with hands and feet.

The evidence was sufficient to show that an ongoing purpose of rosters was to facilitate removals by the NF organization. The personal information contained in a manpower roster enables the jail's OA to confirm the identities of listed persons who are determined to be in bad standing or who are found to be on a BNL and to locate them within the jail. If the OA decides a removal order is necessary, he can use a manpower roster to determine where and to whom to send the order within the jail and when the order can be passed at court.

Further, the evidence as a whole supported an inference that Paigly was a sufficiently knowledgeable and committed member of the NF organization to be fully aware that rosters were used to facilitate removals, a removal was an assault with a razor blade, a removal was a standard consequence imposed on members in bad standing with the organization, and any member of the NF organization in the jail, including himself, could be ordered to execute a removal. Based on circumstantial evidence and the reasonable inferences drawn from that evidence, a trier of fact could reasonably infer from the kites and other evidence that Paigly tacitly agreed with other members of the NF organization to commit "removals" of persons in bad standing with the organization. Further, a trier of fact could reasonably find that Paigly and one or more of the members of the NF organization had the specific intent to agree to commit assault with a deadly weapon or by force likely to produce great bodily injury and, at the time of the agreement, specifically intended to commit the elements of that offense. In light of our conclusion, we need not decide whether the evidence was also sufficient to prove the intent elements of a conspiracy to commit extortion.

Paigly argues that the prosecutor's theory at trial was flawed because "there were many reasons for creating a roster beside conducting removals or committing extortion" but the prosecutor's position was that rosters are prepared for only the purpose of conducting removals or committing extortion. The prosecutor did not argue that the exclusive purpose of a roster was to facilitate the commission of removals and extortions. Regardless, a trier

19

of fact could reasonably infer that Paigly intended the roster to be used for all the usual purposes, including removals.

Paigly points out that "there was no evidence that any of the people on the list committed a removal or an extortion." Such proof is not required. "Conspiracy is an inchoate crime. [Citation.] It does not require the commission of the substantive offense that is the object of the conspiracy. [Citation.]" (*People v. Swain* (1996) 12 Cal.4th 593, 599.) "Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy. [Citations.]" (*People v. Morante*, *supra*, 20 Cal.4th at p. 416, fn. omitted.)

Paigly suggests that his purpose in writing the roster "could have been simply to inform the OA of the identity of the 'manpower' on 4–A without having any idea what eventual use would be made of the list." Paigly asserts that it was "pure speculation to know what [he] intended when he prepared the roster." While we acknowledge there was no direct evidence of Paigly's intent, that is not unusual.

" 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 943.) In assessing the sufficiency of the evidence, "[a]n appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]" (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

In this case, circumstantial evidence and the reasonable inferences drawn from that evidence were sufficient to prove the specific intent elements of a conspiracy to commit a violation of former section 245, subdivision (a)(1), and support the jury's finding that Paigly violated section 186.22, subdivision (a). "Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 358.)

*People v. Paigly*, 2014 WL 5468944, at *16-18.

### 1. Sufficiency of the Evidence

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A court reviewing a conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may a court conclude that the

evidence is insufficient. *See id.* at 324. The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326).

After the enactment of AEDPA, a federal habeas court must apply the standards of *Jackson* with an additional layer of deference. *Juan H. v. Allen,* 408 F.3d 1262, 1274 (9th Cir. 2005). Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of *Jackson* and *Winship* to the facts of the case. *Id.* at 1275.

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (citing *Jackson*, 443 U.S. at 319). "[O]n habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge" unless "the state court decision was objectively unreasonable." *Id.* at 2062 (internal quotation marks omitted). The *Jackson* standard is applied to a crime as that crime is defined by state law. *Jackson*, 443 U.S. at 324 n.16.

### 2. Analysis

Applying these legal principles to petitioner's current allegations, the state court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). Petitioner argues that the roster kite "never reached the leader, but was instead turned over to law enforcement by Chris Klipp." Petition at 6. As noted by the California Court of Appeal, however, under California law, "[c]onspiracy is an inchoate crime." *People v. Swain*, 12 Cal. 4th 593, 599 (1996). "It does not require the commission of the substantive offense that is the object of the conspiracy." *Id.* The prosecution needed only to show that petitioner had the specific intent to conspire to commit an offense. *See People v. Jurado*, 38 Cal. 4th 72, 120 (2006). Here, there was sufficient evidence for

a jury to reasonably conclude that petitioner intended for the kites to reach the OA, regardless of whether they actually did.

Petitioner also argues that the evidence showed that the roster he prepared was merely a "'manpower' roster of members who had already been cleared, and thus were not potential targets for either extortion or assault." Petition at 7. Petitioner appears to be relying on the following testimony by Chris Klipp:

Q: All right. So a roster of all manpower. In your experience, will those types of rosters be sent up the chain of command?

A: Yes.

Q: And why are they sent up the chain of command?

A: To let them know who's placed in that house too, so he knows for himself.

Q: And will those rosters be compared against the BNL?

A: No, those are already cleared members, household members.

Q: And can you tell us, how can you be sure that those names have already been cleared?

A: Because if they wasn't, they put something—they wouldn't put their name on there until they're fully cleared. And if they did something else, then it would say something next to it. It'd say "deemed" or "on freeze," you know.

8RT 2019-20. Petitioner also points to the letter kite itself, which he asserts made clear that "there were no pending situations in Petitioner's unit that would call for assault or extortion." Petition at 7.

Petitioner's argument assumes that he could only have intended to conspire to commit an extortion or removal if one of the people listed on the roster was the target of an extortion or removal. However, there was ample evidence showing that one of the purposes of a manpower roster was to determine who was available to be appointed to positions and assigned tasks, including performing a removal or extorting a gang member. Klipp's testimony confirmed this:

Q: What will that manpower be used for?

A: Well—it could be used—I mean, it could be used for different things. I mean, if [the OA] decides to say "Okay. You know what? I like this dude 'cause this dude's been around. He has a lot of hands-on experience," so on so forth. "I want him to hold this. I want him to hold the position." Or you know, "This dude right here, he owes a little bit of

22

clean-up," or whatever, "Okay. Let's have him do the next removal," so on so forth. So it could be different things.

Q: So that's important information to have to make assignments.

A: Exactly.

Q: Including sometimes to do removals?

A: Exactly.

8RT 2020-21.

Ramirez testified that removals were a "constant occurrence" in the organization. 9RT 2322. Abeyta testified that having a roster was essential to ordering a removal because rosters indicated who was in a specific area and provided information about the individuals listed. 9RT 2227. Rosters had to be updated continually as information came in about members that could affect their status. 9RT 2208-11, 2224-25, 2260-61.

Mendoza testified that, during his time as OA, he would routinely check a manpower roster against the BNL.

Q: So let's go to the third type of reports, you mentioned incident report, you mentioned NA reports, you mentioned rosters. Would you get those when you were an OA?

A: Yeah.

Q: What function do they serve?

A: A roster, basically it's like a security, it's a security net. It let me know who's in the jail, you know, these OA or the building channels they're acting as my eyes and ears throughout the jail. Without them submitting these rosters, there's no way I'm gonna know who's in the jail, and the purpose for that is, you know, when these rosters are filtered up, um, I usually have a master BNL, which is a bad news list or a list of individuals that have fell out of good standing, um, with us. And I would screen 'em through that BNL to make sure they weren't on that list.

So, I mean, if I didn't have these names coming in there would be no way of me finding, you know, locating people that might slip through, informants, people that have been deemed no good. People that might owe fines or things like that.

Q: Why don't the new arrival reports take care of that problem for you? Aren't these individuals already being screened section by section?

A: They do.

…

23

Q: All right. Well, why do you need a roster then after that process to prepare against a BNL if there's been some kind of a screening?

A: Well, because they might—might not be on a master BNL in that part of the jail. I have the master BNL. Being the OA it's my job to run 'em through the screening process. Also, um, you know, there's a lot -- there's a lot of, you know, individuals that are always coming and going. So that's why it's done weekly.

Q: Can a BNL list change from week to week, too?

A: It can.

11RT 2632-33.

Q: All right. So even if these people had been cleared by the manpower in their sections as new arrivals, you would still expect this information, so you could check it against BNL's?

A: Right.

Q: Why is it important?

A: Because they're always being updated, they are never going to stay the same. People are always in transit from week to week, it changes, and it might be individuals in my part of the jail that are back there with me that, you know, when I filter it out they might see somebody on there that slipped through before, you know, somebody new where I'm at, you know, it's happened before.

Q: And why is it important for you to know what section of the jail a person is on a roster?

A: Well, because if I identify somebody that—that's a target or somebody that's in bad standing, I know where to send my filter to have that individual removed.

Q: Okay. Have you ordered removals?

A: Yeah.

Q: And when you were the overall authority how were they typically done?

A: Um, I would tell my buffer, my OA, Pony at that time, um, he would draft up—he would draft up a filter depending on what part of the jail it was going to. It would be concealed, we had different ways where were getting it out. We were kinda restricted in that area, but however it was going out it would be sent out. More than likely on a court date.

Q: Okay, So when you use the term filter you're referring to the same thing as kite or membership in writing?

A: Right.

24

1    Q: And you would have one drawn up ordering the removal?

2    A; Right.

3    Q: And, um, you mentioned it would be on a—sent out on a court date?

4    A: Correct.

5    Q: Why is that?

6

7    A: That's the purpose of the court dates that—being documented on there.  I mean, if, you
     know, hypothetically if I'm building channel I want to know everybody's court dates,
8    because these are my target dates to where I can get, you know, filters going out.  If I got—
     in some these areas you're confined to within that area so you don't have access to the rest
9    of the jail, but if I look on my roster and I see, well, this guy's got a court date coming up
     in four days, this gives me a four day window to draft that up and have it ready to give to
10   him the night before so when he does go to court he runs into somebody in another part of
     the jail, it can be, you know, passed on in the court tunnels and the court things.  That's
11   how it gets moved.

12   Q: Okay.  So that roster serves not only the purpose of allowing you to compare names
13   against the BNL, bad news list, but also provides you with information on how to get your
     order to do a removal back to this section where it needs to be done?
14

15   A: Right.

16   11RT 2645-47.

17        Mendoza also testified that manpower rosters provided location information for gang

18   members and associates so that people who owed "clean-up" could be found.  11RT 2672.

19   According to Mendoza, the rosters indicated who was in the jail for the purpose of providing

20   security to members in general.  11RT 2672-73.  The "number one objective of the organization"

21   was to "provide security to its membership."  11RT 2673.  Taking care of security was

22   synonymous with performing removals.  11RT 2675-76.  Mendoza testified that rosters were

23   important to ensuring a strong, effective organization in all parts of the jail, which in turn made it

24   easier to perform removals and extort money.  11RT 2679-80.  In short, not only was there some

25   evidence that petitioner's roster could have been checked against the BNL such that someone

26   listed on the roster could have become the target of an extortion or removal, but there was

27   significant evidence that such a roster could be used to assign someone associated with NF to the

28   task of committing an extortion or removal.

                                                25

United States District Court
Northern District of California

Mendoza also testified that an active member, educated in the organization, would understand why rosters are needed. 11RT 2676. Here, there was overwhelming evidence that petitioner was an active NF participant and educated in the organization. Petitioner named himself as the author of the kite to "Capolli" to which he had attached the roster. 9RT 2133-35. Therein, he said he had been appointed the block channel and indicated knowledge that the OA had not received a report from his section in six months. *Id.* The kite made reference to the OA's relocation. *Id.* Petitioner urged the OA to make changes to his section, while pledging continued loyalty. *Id.*; 9RT 2141-42. He indicated that he still had incident reports that he had been unable to send up the chain of command. 9RT 2138-39. The kite used language and terminology that was specific to the gang. *See* 9RT 2135-42. Petitioner's closing lines, including "With honor, loyalty, and carnalismo" and "Forever forward," expressed his commitment to and support of the NF organization. 11RT 2643-44. Livingston testified regarding petitioner's prior gang convictions and petitioner's affiliation with the organization going back to at least 2006. 6RT 1601-05, 1677-84. Petitioner told Ramirez he had written the kites because of the "chaos" in unit 4A and said he was trying to "get the manpower on track." 9RT 2320. Petitioner indicated to Ramirez that he thought he could do a better job as authority for unit 4A and asked for Ramirez's advice. 9RT 2322-23. Given this record, there was sufficient evidence for the jury to reasonably infer that petitioner knew how rosters were used by the organization and that petitioner intended for his roster to be used for the usual purposes, including facilitating removals and extortions.

After viewing the evidence presented at trial in the light most favorable to the prosecution and presuming that the jury resolved all conflicting inferences from the evidence against petitioner, the Court finds that a rational juror "could reasonably have found beyond a reasonable doubt" that petitioner entered into a conspiracy with the specific intent to commit removals or extortions. *Jackson*, 443 U.S. at 325-26. Mindful of the "sharply limited nature of constitutional sufficiency review" and applying the "additional layer of deference" required by AEDPA, this Court is unable to find that the California court's rejection of this claim was objectively unreasonable. *Juan H.*, 408 F.3d at 1274-75; *see also Jackson*, 443 U.S. at 319, 326. Accordingly, petitioner is not entitled to habeas relief.

**C.      Certificate of Appealability**

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard. *Id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

**IT IS SO ORDERED.**

Dated:  7/13/2017


HAYWOOD S. GILLIAM, JR.
United States District Judge